2023-1570

# United States Court of Appeals
# for the Federal Circuit

---

## MEYER CORPORATION, U.S.,

### Plaintiff-Appellant,

*v.*

### UNITED STATES,
### Defendant-Appellee.

---

Appeal from the United States Court of International Trade,
No. 13-cv-00154, Senior Judge Thomas J. Aquilino.

---

## PRINCIPAL BRIEF OF PLAINTIFF-APPELLANT MEYER
## CORPORATION U.S.

---

John P. Donohue
*Counsel of Record*
NEVILLE PETERSON LLP
100 N. 18th Street, Ste. 300
Philadelphia, PA 19103
(267) 207-3421
jdonohue@npwny.com

John M. Peterson
Patrick B. Klein
NEVILLE PETERSON LLP
55 Broadway, Suite 2602
New York, NY 10006
(212) 635-2730
jpeterson@npwny.com

Richard F. O'Neill
NEVILLE PETERSON LLP
701 Fifth Ave, Ste. 4200-2159
Seattle, WA 98104
(206) 905-3648
roneill@npwny.com
*Attorneys for Plaintiff-Appellant*

May 9, 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2023-1570

**Short Case Caption** Meyer Corporation, U.S. v. US

**Filing Party/Entity** Meyer Corporation, U.S.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 03/23/2023

Signature: /s/ John P. Donohue

Name: John P. Donohue

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| Meyer Corporation, U.S. | | Meyer International Holdings, Ltd. Parent Company, not publically traded |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑   None/Not Applicable          ☐   Additional pages attached

|  |  |  |
| --- | --- | --- |
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑   Yes (file separate notice; see below)   ☐   No   ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable          ☑   Additional pages attached

|  |  |  |
| --- | --- | --- |
|  |  |  |
|  |  |  |

# TABLE OF CONTENTS

PAGE

CERTIFICATE OF INTEREST ................................................. ii

TABLE OF CONTENTS ........................................................ iii

TABLE OF AUTHORITIES .................................................... iv

JURISDICTIONAL STATEMENT ........................................... 2

STATEMENT OF RELATED CASES .................................... 2

STATEMENT OF THE ISSUES.......................................... 3

STATEMENT OF THE CASE ............................................. 4

SUMMARY OF THE ARGUMENT .................................... 14

ARGUMENT ..................................................................... 17

I.      Standard of Review.................................................. 17

II.     The CIT Did Not Follow this Court's Remand Instructions. ....................... 17

III.    The CIT Erred When it Found as a Matter of Law that Meyer U.S. Was Obligated to Furnish the Financials of its Parent Company, MIH. ............... 21

        A.      The Circumstances of Sale Tests. ................................. 22

                1.      Normal Pricing Practices Test. ............................... 24

                2.      All Costs Plus Profit Test........................................ 25

                3.      Relevance. ................................................................. 33

IV.     The CIT Again Failed to Discharge its *Jarvis Clark* Obligations.................. 35

V.      This Court Should Remand Back to the CIT With Instructions to Conduct a New Trial as to Whether the Tests Set Out in 19 C.F.R. § 152.103(l) are Satisfied. ........................................................ 43

CONCLUSION ..................................................................... 47

# TABLE OF AUTHORITIES

PAGE(S)

**Cases**

*American Express Co. v. United States*, 262 F. 3d 1376 (Fed. Cir. 1996) ..............33

*Ashland Chemical Co. v. United States*, 7 C.I.T. 362 (1984) ..................................39

*Auer v. Robbins* 519 U.S. 452 (1997) ........................................................................33

*Bell BCI Co. v. United States*, 570 F.3d 1337 (Fed. Cir. 2009) .............................17

*Bobb v. Mod. Prod. Inc*., 648 F.2d 1051(5ᵗʰ Cir. 1981) ...........................................46

*Campbell Soup Co. v. United States*, 107 F.3d 1556 (Fed. Cir. 1997) ...................39

*Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) ...........................46

*Eli Lilly v. Board of Regents* 334 F. 3d 1264 (Fed. Cir. 2003) ...............................33

*EOS of N. Am., Inc. v. United States*, 37 C.I.T. 637 (2013) ....................................26

*Epic Sys. Corp. v. Tata Consultancy Svcs. Ltd.*, 971 F.3d 662 (7ᵗʰ Cir. 2020) .......34

*Federal Trade Commission v. Washington Data Resources*, 2011 U.S. Dist.
   LEXIS 72886 (M.D. Fla. 2011) .............................................................................46

*Gautreaux v. Spurlock Marine Inc.*, 107 F.3d 331 (5ᵗʰ Cir. 1997) ........................46

*Great N. Ins. Co. v. Power Cooling, Inc*., 2007 U.S. Dist LEXIS 66798
   (E.D.N.Y. 2007) .....................................................................................................35

*Guess? Inc. v. United States*, 944 F.2d 855 (Fed. Cir. 1991) .................................17

*Huddleston v. United States*, 485 U.S. 681 (1988) ..................................................34

*Ingalls Shipbuilding v. United States*, 857 F.2d 1448 (Fed. Cir. 1988) .................14

*Intercontinental Marble Corp. v. United States*, 381 F.3d 1169 (Fed. Cir.
   2004) ......................................................................................................................26

*Jarvis Clark Co. v. United States*, 733 F.2d 873 (Fed. Cir. 1984) ................. passim

*Kalloo v. Unlimited Mech. of New York*, 977 F. Supp. 2d 187 (E.D.N.Y
   2013) ......................................................................................................................46

*La Perla Fashions, Inc. v. United States*, 9 F. Supp. 2d 698 (1998) ......................41

*Litman v. Mass. Mutual Ins. Co*., 825 F.2d 1506 (11ᵗʰ Cir. 1997) .........................46

*Luigi Bormioli Corp. v. United States*, 24 C.I.T. 1148 (2000) ...............................21

*Luigi Bormioli Corp. v. United States*, 304 F.3d 1362 (Fed. Cir. 2002) ...............21

*Lynteq Inc. v. United States*, 976 F.2d 693 (Fed. Cir. 1992) ..................................17

*Magnivision Inc. v. Bonneau* Co. 115 F. 3d 956 (Fed. Cir. 1997) .........................34

*Mead Corp. v. United States*, 553 U.S. 218 (2001) ................................................29

*Meyer Corporation U.S. v. United States*, 2021 Ct. Int'l Tr. LEXIS 26
   (2021) ................................................................................................ passim

*Meyer Corporation, U.S. v. United States*, 43 F.4ᵗʰ 1325 (2022) .................... passim

*Monaghan v. Telecom Italia Sparkle of N. Am*, 647 F. Appx. 763 (9ᵗʰ Cir.
   2016) ......................................................................................................................46

*Nissho-Iwai America Corp. v. United States*, 982 F.2d 505 (Fed. Cir. 1992). passim

iv

PAGE(S)

*Peerless Clothing Int'l, Inc. v. United States*, 602 F. Supp. 2d 1309 (Ct. Int'l Tr. 2009) ................................................................................................40

*Perez v. Mortgage Bankers Assn*, 575 U.S. 92 (2015) .............................................29

*Perlmutter v. U.S. Gypsum Co.*, 54 F.3d 659 (10th Cir 1995) ...............................46

*Reino de Espana v. Am. Bureau of Shipping*, 2007 U.S. Dist LEXIS 41498 (S.D.N.Y. 2007) ......................................................................................34

*Skechers USA Inc. v. United States*, 27 C.I.T. 1225 (2003) ...................................21

*Sovulj v. United States*, 2005 U.S. Dist LEXIS 46700 (E.D.N.Y. 2005) ...............34

*Target Corp. v. United States* 31 C.I.T. 154 (2007) ...............................................41

*United States v. Abel*, 469 U.S. 45 (1984) ..............................................................34

*VWP of Am. v. United States*, 163 F. Supp. 2d 645 (Ct. Int'l Tr. 2001).................41

*Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212 (S.D.N.Y. 2003) ........................35

**Statutes**

19 U.S.C. § 1401a ......................................................................................... passim
28 U.S.C. § 1295 .......................................................................................................2
28 U.S.C. § 1581 .......................................................................................................2
28 U.S.C. § 2107 .......................................................................................................2
28 U.S.C. § 2643 ...................................................................................................9, 22
28 U.S.C. § 2645 .......................................................................................................2
Pub. L. 96-417, 94 Stat. 1727 (96th Cong., 2d Sess. 1980).....................................39

**Regulations**

19 C.F.R. § 152.103 ....................................................................................... passim
19 C.F.R. § 177.9 .....................................................................................................27

**Other Authorities**

Corporate Finance Institute, Definition of Holding Company, CorporateFinanceInstitute.com ................................................................... 21, 28

*Determining the Acceptability of Transaction Value for Related Party Transactions (an Informed Compliance Publication),* U.S. Customs and Border Protection (April 2007) .......................................................... 7, 27, 29, 31

General Agreement on Tariffs and Trade, Article 1, Oct. 30, 1947, 61 Stat. A-11, 55 U.N.T.S. 194 ........................................................................................24

Investopedia, Definition of Holding Company, Investopedia.com ..........................20

Mark K. Neville Jr., *The Customs Valuation Agreement: Origins, Standards and Interpretations* (1st ed. 2023)................................................................. 31, 32

Merriam-Webster, Definition of Holding Company, Merriam-Webster.com.........20

Sherman and Glashoff, *Customs Valuation: Commentary on the GATT Customs Valuation Code* (2d ed.) ................................................................ 25, 42

PAGE(S)

Statement of Administrative Action accompanying the Trade Agreements
   Act of 1979, H. Rep. No. 4537, reproduced in 1979 U.S.C.C.A.N 665 .............30

**2023-1570**

# United States Court of Appeals for the Federal Circuit

---

**MEYER CORPORATION, U.S.,**

*Plaintiff-Appellant,*

***v.***

**UNITED STATES,**

*Defendant-Appellee.*

---

Appeal from the United States Court of International Trade,
No. 13-cv-00154, Senior Judge Thomas J. Aquilino

---

## PRINCIPAL BRIEF OF PLAINTIFF-APPELLANT, MEYER CORPORATION, U.S.

Plaintiff-Appellant, Meyer Corporation, U.S. ("Meyer"), in accordance with Rules 28(a) and 32(a) of the Federal Rules of Appellate Procedure and the Rules of Practice of the U.S. Court of Appeals for the Federal Circuit, hereby submits its principal brief in this appeal.

## JURISDICTIONAL STATEMENT

Plaintiff-Appellant, Meyer Corporation, U.S., appeals from the final decision of the United States Court of International Trade ("CIT") in *Meyer Corporation, U.S. v. United States*, Slip Op. 23-13, dated February 9, 2023, Appx1-12.

Meyer Corporation, U.S., filed a timely notice of appeal on February 27, 2023, pursuant to 28 U.S.C. §§ 2107 and 2645(c) and Rule 4(a)(4) of the Federal Rules of Appellate procedure. The CIT possessed subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1581(a), and this Court has appellate jurisdiction pursuant to 28 U.S.C. § 1295(a)(5). The appeal was docketed in this Court on March 10, 2023.

## STATEMENT OF RELATED CASES

In accordance with Rule 47.5 of the Rules of Practice of the U.S. Court of Appeals for the Federal Circuit, counsel for Plaintiff-Appellant Meyer Corporation, U.S. makes the following statement:

1. Counsel for Plaintiff-Appellant state that this civil action was previously before the U.S. this appellate court in: *Meyer Corporation, U.S. v. Unites States*, Court No. 21-1932. The panel consisted of Chief Judge Moore, and Circuit Judges Clevenger and Hughes. The Court's previous decision was dated August 11, 2022, and is reported in the Federal Reporter at the following citation: *Meyer Corporation, U.S. v. United States*, 43 F.4th 1325 (2022).

2.  Counsel for Plaintiff-Appellant are aware of the following actions, currently pending in the U.S. Court of International Trade, which will directly affect or be affected by this Court's decision in the instant appeal. All of the cases are captioned *Meyer Corporation U.S. v. United States*, and have the following docket numbers: 13-00181; 13-00182; 13-00226; 13-00227; 13-00258; 13-00259; 13-00266; 13-00322; 13-00323; 13-00405; 14-00118; 14-00277; 15-00018; 15-00019; 15-00091; 15-00092; 15-00191; 15-00332; 16-00112; 16-00271; 18-00052; 19-00114; 20-00014; 20-02084; 20-03085; and 21-00103.

## STATEMENT OF THE ISSUES

1.  Whether the trial court properly followed this Court's previous remand instructions when it failed to review the "first sales" of imported cookware to determine if they were an acceptable basis for determining the dutiable "transaction value" of such cookware for Customs valuation purposes.

2.  Whether the trial court erred in holding, as a matter of law, that Meyer U.S. was obligated to furnish the financial statement of its parent company to prove the absence of any non-market influences in its claims for "first sale" transaction value appraisement of its merchandise under the rule set out by this Court in *Nissho-Iwai America Corp. v. United States,* 982 F.2d 505 (Fed. Cir. 1992).

3.  Whether the trial court failed to discharge its obligation under *Jarvis Clark Co. v. United States*, 733 F.2d 873 (Fed. Cir. 1984) ("*Jarvis Clark*"), by accepting

the "second sale" price from related middlemen to Meyer U.S. as the basis for transaction value, without examining whether those sales suffered from the same alleged defects which caused rejection of the "first sale" prices.

## STATEMENT OF THE CASE

This Customs valuation case comes before this Court for the second time. The central issue is the proper appraisement, under Section 402(b) of the Tariff Act of 1930, *as amended,* 19 U.S.C. § 1401a(b), of cookware and cookware sets produced in China and Thailand, and imported by Plaintiff-Appellant, Meyer Corp. U.S.

It is undisputed that the merchandise here was subject to two *bona fide* sales for exportation to the United States: the Thai-origin cookware was produced by Meyer Industries Ltd. ("MIL") of Laem Chabang, Thailand, and sold "for export to the United States" to Meyer Marketing (Macau Commercial Offshore), Ltd. ("MMC"), a trading company, which subsequently resold them to Plaintiff-Appellant Meyer Corporation U.S., which acted as importer of record ("IOR").

The Chinese-origin cookware was produced by Meyer Zhaoqing Metal Products Co. ("MZQ") of Zhaoqing, China. MZQ sold the goods "for exportation to the United States to Meyer Hong Kong Ltd. ("MHK"), a Hong Kong trading company, which subsequently resold them to Meyer Corporation U.S.

It is undisputed that the subject merchandise was shipped directly from its country of manufacture to the United States. It is also undisputed that all parties to

4

these transactions are "related" companies as defined in Section 402(g) of the Tariff Act, 19 U.S.C. § 1401a(g).

United States Customs and Border Protection ("Customs" or "CBP") appraised the cookware in liquidation on the basis of "transaction value," 19 U.S.C. § 1401a, based on the "second sale" prices from the Macau (*i.e.,* MMC) and Hong Kong (*i.e.,* MHK) trading companies to Meyer U.S. Invoking this Court's holding in *Nissho-Iwai American Corp. v. United States,* 982 F.2d 505 (Fed. Cir. 1992), Plaintiff-Appellant Meyer U.S. timely protested these assessments, contending that the goods should be appraised According to transaction value based on the prices in the "first sales" for exportation, *i.e.,* those between the manufacturers and the trading companies.

The issue tried before the lower court was whether the relationship between the sellers and the buyers in the "first sales" influenced the "price actually paid or payable" for the merchandise. The relevant regulation, 19 C.F.R. § 152.103(l)(1), provides a two-part test (set out directly below), *either part of which,* if established, will sustain the integrity of the related party price.

First, 19 C.F.R. § 152.103(l)(1)(ii) (known as the "normal pricing practices" test), states that if a buyer and seller, though related, buy and sell from each other as if they were not related, this will show that the related party prices are acceptable as the basis for transaction value. Plaintiff's expert witness, Mr. Craig Pinkerton of

5

PriceWaterhouseCoopers ("PWC"), testified that the margins in Plaintiff's related party sales were comparable to those in sales between unrelated parties, as shown in a transfer pricing study conducted by PWC. Appx34, 54.

Second, 19 C.F.R. § 152.103(l)((1)(iii) (known as the "all costs plus profits test"), states that a seller's price in a related party sale will be acceptable if it allows for recovery of all the seller's costs, plus a profit representative of the firm's overall profit, providing:

> (iii) Interpretative note 3. If it is shown that the price is adequate to ensure recovery of all costs plus a profit which is **equivalent to the firm's overall profit** realized over a representative period of time (*e.g.,* on an annual basis), in **sales of merchandise of the same class or kind**, this would demonstrate that the price has not been influenced.

19 C.F.R. § 152.103(l)(1)(iii) (emphasis added). Mr. Pinkerton again testified that the profits earned in the sales in question were comparable to the overall profit of the manufacturing/selling entities. Appx34, 54.

Defendant did not present any testimony from fact or expert witnesses. The Government's only witness, Monika Brenner, an attorney with Customs' Office of Regulations and Rulings, testified that in performing the analysis required by 19 C.F.R. § 152.103(l)(1)(iii), CBP had a "preference" to compare the seller's profits to the profits of its "parent" company in sales of goods of the same class or kind. Appx43-44. This preference was expressed in an agency document entitled *Determining the Acceptability of Transaction Value for Related Party Transactions (an*

*Informed Compliance Publication),* U.S. Customs and Border Protection (April 2007), at 9. Appx38-39. In this case, however, the sellers' parent company, Meyer International Holdings, Ltd. ("MIH"), a British Virgin Islands holding company, did not sell any merchandise so the "preferred" comparison could not be performed.

In its first decision following trial, the CIT, per Senior Judge Thomas Aquilino, held that the goods could not be appraised using the "first sale" appraisement rule of *Nissho-Iwai, supra,* based on speculation that the prices might be tainted by unspecified "non-market economy country" effects or influences resulting from the designation of the People's Republic of China as a "nonmarket economy country" for purposes of the antidumping and countervailing duty ("AD/CVD") laws.[1] These "non-market economy country" influences purportedly affected the goods manufactured in China, and the goods manufactured in Thailand with the use of Chinese-origin inputs (*i.e.,* metal discs). The lower court also speculated that these "non-market economy country influences" might emanate from the holding company, MIH, even though it is undisputed that MIH does not engage in production or sale of any merchandise. While the Government sought nonparty MIH's consolidated financial statements in discovery, Meyer U.S. did not produce them as (1) Meyer

---

[1] *Meyer Corporation U.S. v. United States,* 2021 Ct. Int'l Tr. LEXIS 26 (2021).

U.S. did not possess them; and (2) they were not relevant to the issues posed by the case.

The lower court ruled that the "non-market economy country influences" suspected to emanate from MIH rendered the "first sale" prices unsuitable as the basis of "transaction value." Without examining the "second sales" for such influences, the CIT sustained Customs' use of those prices as the basis for transaction value, even though the parties to such "second sales" were—as with the rejected first sale prices—owned by MIH.

In the previous appeal, this Court vacated and remanded the lower court's determination as to dutiable value, holding:

> The trial court misinterpreted our decision in *Nissho Iwai* to require any party to show the absence of all "distortive nonmarket influences." There is no basis in the statute for Customs or the court to consider the effects of a nonmarket economy on the transaction value. The statute requires only that "the relationship between [the] buyer and seller did not influence the price actually paid or payable." 19 U.S.C. § 1401a(b)(2)(B). This provision concerns effects of the relationship between the buyer and seller, not effects of government intervention, and especially not with government intervention that affects the industry as a whole. Neither *Nissho Iwai* nor the government's briefing identifies other statutes or regulations that could require Customs or the Court of International Trade to consider whether the goods were sold in a nonmarket economy or were otherwise affected by a nonmarket economy.

*Meyer Corp., U.S. v. United States*, 43 F.4th 1325, 1332-1333 (Fed. Cir. 2022).

Following remand, Meyer U.S. requested a status conference to discuss next steps and the need for further proceedings. Appx30. Judge Aquilino refused this request and did not conduct any further proceedings pursuant to 28 U.S.C. § 2643(b), but rather issued a new opinion which, confusingly, "affirmed" the judgment this Court had previously vacated. Appx12. In so doing, the court first questioned this Court's finding that a country's "non-market economy" status under the trade remedy laws was irrelevant to the appraisement of goods for Customs purposes.[2] Purporting to rely on the record made at trial, the lower court made no mention of whether the "first sale" prices comported with the test set out in 19 C.F.R.

---

[2] The lower court stated:

> **That does not mean, however, the statute <u>as written</u> necessarily contemplates zero distinction between sellers operating in market economies and those operating in nonmarket economies**, particularly in view of the judge-made "first sale" rule on the "price paid or payable" of 19 U.S.C. §1401a(b)(1) ("[i]f sufficient information is not available, for any reason,3 with respect to any amount" necessary to increase the "price actually paid or payable for imported merchandise … by the amounts attributable" to the items listed as (A) through (E) of §1401a(b)(1)(packing costs, selling commissions, assists, royalties, license fees, and, of some import to this case, "the proceeds of any subsequent resale, disposal, or use of the imported merchandise that accrue, directly or indirectly, to the seller"), then the transaction value of the imported merchandise concerned "shall" be treated as one that cannot be determined). It was the CAFC itself, in fact, which articulated the concept of "the absence of any non-market influences that affect the legitimacy of the sales price"—apart from the language of the statute itself. *See Nissho Iwai Am. Corp. v. United States*, 982 F.2d 505, 509 (Fed.Cir. 1992).

Appx3-Appx4 (bold facing added; underscoring in the original).

§ 152.103(l)(l)(iii), nor did it consider the "second sales" at all. Instead, the court again rested its decision solely on the absence of the financial record of the holding company MIH.[3] Previously suspected by the Trade Court of channeling "non-market economy country influences," MIH was now suspected—indeed, *presumed*—to have channeled to its operating subsidiaries some form of aid which might have distorted the *cost* of producing the imported goods, Appx9:

> The fact that the government herein was not provided with the financial information pertinent to plaintiff's parent company hampered its ability to discern whether or not the parent of the plaintiff provided any form of assistance to reduce costs.

Of course, this observation is flatly incorrect. The books and records of the manufacturers and sellers had previously been examined by Mr. Pinkerton and no such inflows from MIH were detected. Appx51.

However, the lower court "affirmed" and restated the findings of his prior (vacated) opinion, using ellipses to replace the previous opinion's references to

---

[3] In pretrial discovery, Defendant requested the consolidated financial statement of MIH, which Plaintiff declined to produce on relevance grounds, noting that that company was not involved in sales of merchandise of the same class or kind (or any merchandise), and that its records were irrelevant to the test set out in 19 C.F.R. § 152.103(l)(1)(iii). **The Government never pursued the MIH records,** nor did the Government undertake any showing of why the financials might be relevant in light of the limiting language of the regulation that requires a "seller v. seller" comparison. It did not seek, and the Trade Court never issued, an order directing production of the MIH information.

"non-market economy country" influences. For ease of comparison, we set out below the statements from the Trade Court's remand opinion, alongside those from its initial opinion (words removed from the latter in boldface):

| Remand Opinion | Original Opinion[4] |
|---|---|
| Even if "true" costs of such inputs could be determined, Meyer Holding[s] presumptively has had the ability to influence the price paid or payable for them, for example by providing its subsidiaries access to credit and capital on terms that are not available to competitors without the same level of bargaining power with creditors, or even at "below market" rates. Without financial statements, the court has no concept of the extent to which the finances of the Meyer group units are truly independent "silos" of one another … Appx9. | Even if "true" costs of such inputs could be determined, Meyer Holding presumptively has had the ability to influence the price paid or payable for them, for example by providing its subsidiaries access to credit and capital on terms that are not available to competitors without the same level of bargaining power with creditors, or even at "below market" rates. Without financial statements, the court has no concept of the extent to which the finances of the Meyer group units are truly independent "silos" of one another, **or the extent to which there might have been state influence or assistance to some degree.** |
| The most that plaintiffs' witnesses could testify to was that they were unaware of any such assistance … At trial, the defendant only lightly explored the extent to which such considerations might be considered [ ]distortive. But then again, the defendant never had the ability to probe deeper, in part because it was never provided the financial information it requested in discovery in order to be able to ask or answer probing questions. Appx9 | The most that plaintiffs' witnesses could testify to was that they were unaware of any such assistance, **and to a person they flatly denied that the PRC government provided any assistance or influence whatsoever, arguably a dubious proposition.** At trial, the defendant only lightly explored the extent to which such considerations might be considered **market**-distortive. But then again, the defendant never had the ability to probe deeper, in part because |

---

[4] *See e.g., Meyer Corporation U.S. v. United States,* 2021 Ct. Int'l Tr. LEXIS 26, at *141-43 (2021).

|  | it was never provided the financial information it requested in discovery in order to be able to ask or answer probing questions. |
|---|---|
| The court understands that the Meyer parent is not subject to this litigation and that the plaintiff, as its "independent" subsidiary, can claim an inability to obtain such information from it. However, given that the parent has an interest in seeing these types of matters resolved favorably, it is therefore presumed to be forthcoming, even unprompted, to provide whatever CBP deems necessary to assist in their resolution, and the fact that in that regard there has apparently been considerable "resistance" throughout this case to that not unreasonable discovery request and the "assistance" that the parent could have provided its subsidiary to address necessary questions … , speaks volumes. Appx9-Appx10. | The court understands that the Meyer parent is not subject to this litigation and that the plaintiff, as its "independent" subsidiary, can claim an inability to obtain such information from it.  However, given that the parent has an interest in seeing these types of matters resolved favorably, it is therefore presumed to be forthcoming, even unprompted, to provide whatever CBP deems necessary to assist in their resolution, and the fact that in that regard there has apparently been considerable "resistance" throughout this case to that not-unreasonable discovery request and the "assistance" that the parent could have provided its subsidiary to address necessary questions **with respect to concerns over non-market influences**, speaks volumes. |
| … [T]he foregoing leads the court to doubt that accurate ascertainment of the "true" value of the "price paid or payable" at the first sale level in the customs duty sense has been demonstrated in this case. Appx10. | **All of** the foregoing leads the court to doubt that accurate ascertainment of the "true" value of the "price paid or payable" at the first sale level in the customs duty sense has been demonstrated in this case. |

As depicted in the comparison above, the lower court merely restated its prior conclusions regarding "non-market economy country" influences, *eliminating some words*, to give the impression that these holdings—now restated—reflected the Court's concerns with factors *other than* State-related distortions.

The use of ellipses gives a distorted view of the trial record. The first redacted passage suggests that the absence of MIH records somehow affected the behavior of private parties who engaged in the transactions at bar, when in fact the lower court's concern was with the extent of "State influence and assistance." The second excerpted paragraph would create the impression that the testimony of Plaintiff-Appellant's witnesses was related to something other than State influence, when the referenced testimony was *only* about whether the Meyer entities received governmental benefits. The third excerpted paragraph suggests that the holding company information deprived Customs of information "to address necessary questions" about subjects other than "concerns over non-market influences," even though the court previously held that its concerns were that MIH's records might (in some inexplicable way) shed light on "non-market economy country influences."

This Court previously determined that the existence or lack of "non-market economy country influences" was irrelevant to the Customs valuation issue being considered.[5] However, on remand, the lower court did not examine whether the relationships between buyers and sellers in the related transaction had any impact on the "price paid or payable" for the goods in question. It did not look at buyers and sellers at all, nor at the "first sales" or "second sales." Instead, having conceded that

---

[5] *Meyer Corp U.S. v. United States*, 43 F.4th 1325 (Fed. Cir. 2022).

13

the holding company MIH "is not subject to this litigation" and that Meyer U.S. could validly "claim an inability to obtain such information from it," Appx9, the lower court concluded, speculatively, that the absence of MIH data[6] absolved it of any further obligation to review the trial record or conclude whether the "first sales" or the "second sales" provide a legally viable basis for transaction value. Of course, Plaintiff had a more legally grounded objection compared to the Trial Court's un-supported conjecture. Indeed, the holding company financials were not produced *only* because they are *irrelevant* to the 19 C.F.R. § 152.103(l)(1)(iii) test which man-dated a seller v. seller comparison.

## SUMMARY OF THE ARGUMENT

Unfortunately, the lower court's reaction to this Court's prior order of vacatur and remand did not significantly progress this litigation. In its first opinion, the CIT concluded that the absence of the MIH records limited its ability to probe for evi-dence of "non-market economy influences." Having been told by this Court that such influences are not a material consideration in a value case of this type, the lower

---

[6] The result is akin to the Court imposing a "discovery sanction" of dismissal for failure to produce the MIH records, even though (1) Plaintiff unquestionably did not possess or have access to the records; (2) Plaintiff raised objections to the Government request on relevance and other grounds; (3) Defendant never sought or ob-tained an Order to Compel production; and (4) Plaintiff never disobeyed an Order to Compel. Willful and bad faith disobedience of an order to compel is a necessary prerequisite to a discovery sanction of dismissal. *Ingalls Shipbuilding v. United States*, 857 F.2d 1448, 1451 (Fed. Cir. 1988).

court now concludes that the absence of the non-party MIH information, in some unarticulated way, "provided an independent reason as to why Meyer could not demonstrate a true first-sale value absent of influence - not from a nonmarket-economy country *per se*—but from the relationships of the related parties." Appx10. Ironically, the lower court upheld the Government's "second sale" appraisements, even though those sales are *also between companies owned by MIH*, and such sales would presumably be subject to any imagined taint emanating from MIH.

On appeal, Plaintiff-Appellant raises two major assignments of error: First, Meyer U.S. contends that the Trade Court erred in its rejection of "first sale" prices based on the absence of the MIH financials. Rather, the preponderance of evidence on the trial record establishes that the first sale prices allow for recovery of all costs plus a profit consistent with sales of the same class or kind of goods, and that Meyer U.S. meets the test of acceptability set out in 19 C.F.R. § 152.103(l)(1)(iii). Plaintiff-Appellant further submits that the text of the regulation calls for the seller's profits in the sales under investigation to be compared with the seller's overall profits—not the profits of a parent corporation; and certainly not the profits of a parent corporation which does not sell goods of the same "class or kind" as those undergoing appraisement.

Second, Plaintiff-Appellant contends that the lower court erred in failing to discharge its duty under *Jarvis Clark Co., v. United States*, 733 F.2d 873 (Fed. Cir.

1984) to "find the correct result" in every case. If Meyer U.S. succeeds in proving that the "first sale prices" are an acceptable basis of transaction value, the inquiry is at an end. But if, for any reason, the relationships of the parties disqualify the "first sale" prices as being an acceptable basis of "transaction value," the Court must inquire as to whether the "second sale" prices are similarly disqualified, and the goods must be appraised using a different statutory method. In this case, the CIT once again upheld appraisement of Plaintiff-Appellant's goods based on "second sales" which it wholly failed to examine.

The subject merchandise imported by Meyer U.S. was entitled to appraisement under the *Nissho-Iwai* "first sale rule" because the trial record shows that the goods were sold pursuant to a bona fide sale; at arm's length; were clearly destined for export to the United States; and were not subject to non-market influences affecting the sales price—the criteria established by this Court's 1992 *Nissho-Iwai* holding. *Supra*.

Having rejected "first sale" transaction value under the *Nissho-Iwai* rule, the lower court improperly adopted the "second sales" from the middlemen to the related importer as the basis for "transaction value" without examining those sales for evidence of the same "nonmarket economy effects" or influence from the holding company which owned them all. In so doing, the lower court ignored its obligation, under *Jarvis Clark Co. v. United States*, 733 F.2d 873 (Fed. Cir. 1984), and its progeny, to

16

"reach the correct result" by whatever means possible, and to not be limited to the options advanced by the parties. This error alone warrants remand.

The decision of the lower court should again be vacated, and this case remanded with instructions to conduct a new trial on the acceptability of the related party prices in the "first sale" transactions.

## **ARGUMENT**

### I.    **Standard of Review.**

This Court reviews legal holdings *de novo* and examines factual findings for clear error. *Bell BCI Co. v. United States,* 570 F.3d 1337, 1340 (Fed. Cir. 2009). The Court also reviews the lower court's interpretation of statutory provisions *de novo. Lynteq Inc. v. United States*, 976 F.2d 693, 696 (Fed. Cir. 1992); *Guess? Inc. v. United States*, 944 F.2d 855, 857 (Fed. Cir. 1991).

### II.    **The CIT Did Not Follow this Court's Remand Instructions.**

The first appeal in this case reached this Court after the CIT rejected the "first sale" prices of Meyer U.S., based on suspected, unidentified "non-market economy country" influences—some of which, the lower court speculated, might have emanated from Meyer's holding company, MIH. This Court ruled that the existence of possible "non-market economy country effects" was irrelevant to the determination of transaction value, vacated the CIT's decision, and remanded with instructions "for the court to reconsider whether Meyer may rely on the first-sale price." *Meyer Corp.,*

17

*U.S. v. United States*, 43 F.4th 1325, 1333 (Fed Cir. 2022). On remand, however, the lower court did not examine the first sale prices at all. Rather, it simply "affirmed" the prior, vacated judgment, restating nearly all conclusions in the vacated decision, while replacing references to "non-market economy effects" with ellipses.

Rather than examining the trial record concerning the "first sales," the lower court returned its focus to the absence of the MIH data, and articulated a new *presumption,* stating that:

> Even if "true" cost of inputs could be determined, **Meyer Holding[s] *presumptively* has had the ability** to influence the price paid or payable for them, for example by providing its subsidiaries access to credit and capital on terms that are not available to competitors without the same level of bargaining power with creditors, or even at "below market" rates."

Appx9 (emphasis added).[7] Based on that *presumption*, unsupported by any evidence, the CIT concluded that no further proceedings were required (Appx11 (emphasis added)):

> Finally, this court considers that the CAFC's holding of *Nissho Iwai*'s "nonmarket influences" as simply referring to influences growing out of the relationship of buyer and seller that distort the price paid or payable, coupled with its "remand for th[is] court to reconsider whether Meyer may rely on the first-sale price," **negates any need for further proceedings now**.

---

[7] In its previous opinion, the lower court surmised that the "true" cost of inputs to produce the imported cookware could not be known, due the possibility of "nonmarket economy country influences." *Meyer Corp., U.S. v. United States*, 2021 Ct. Intl. Trade LEXIS 26 at *50.

18

This brusque disposition disregarded this Court's remand instructions. Instead of examining either the "first sales" or "second sales," the lower court returned to the holding company, MIH—which was not a party to *any* sales and is not even a party to the proceeding. Previously suspected of having somehow channeled "non-market economy country influences," the lower court now *presumes* MIH conferred some unspecified distortions rendering the "first sale" prices unusable as the basis for dutiable transaction value (while leaving the "second sales" unexamined). There is no evidence of any such assistance by MIH.

This disposition leaves a few things to unpack. First, the notion that a holding company provided credit and capital to its operating companies is contrary to the nature of holding companies. A holding company's purpose is to own and manage shares or interests of other companies.[8] Rather than producing goods or services itself,[9] a holding company focuses on the strategic management and financial aspects

---

[8] The Merriam-Webster Dictionary defines a "holding company" as "a company whose primary business is holding a controlling interest in the securities of other companies." Merriam-Webster, Definition of Holding Company, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/holding%20company (last accessed April 30, 2023)

[9] As *Investopedia* notes:

> A holding company is a business entity—usually a corporation or limited liability company (LLC). Typically, a holding company doesn't manufacture anything, sell any products or services, or conduct any other business operations. Rather, holding companies hold the controlling stock in other companies.

19

of its subsidiaries or investments. Typically, a holding company does not engage in manufacturing or any other direct operations of the businesses it controls.[10] Instead, it provides benefits such as asset protection, risk management, and tax optimization by overseeing and managing the companies under its ownership. Here, it is undisputed that MIH is indeed a holding company that is not engaged in manufacturing operations or the sale of goods.

Second, the lower court never explained the significance of its concern that the companies involved in the transactions at bar might have received the benefit of:

> … access to credit and capital on terms that are not available to competitors without the same level of bargaining power with creditors, or even at "below market" rates.

Appx9. Of course, nothing in the transaction value statute, 19 U.S.C. § 1401a(b), contemplates "access to credit and capital," nor a commercial actor's bargaining leverage with creditors, nor the interest rates paid for financing as factors in determining

---

Investopedia, Definition of Holding Company, Investopedia.com, https://www.investopedia.com/terms/h/holdingcompany.asp (last accessed April 30, 2023).

[10] The *Corporate Finance Institute* defines a "holding company" as:

> … a company that doesn't conduct any operations, ventures, or other active tasks for itself. Instead, it exists for the purpose of owning assets. In other words, the company does not engage in the buying and selling of any products and services. Instead, it was formed so that it gains control over one or more companies.

Corporate Finance Institute, Definition of Holding Company, CorporateFinanceInstitute.com, https://corporatefinanceinstitute.com/resources/management/holding-company/ (last accessed April 30, 2023).

the acceptability of a price as the basis for "transaction value."[11] What the statute *does* concern itself with is how imported goods are priced and, in a related-party sale situation, whether those prices allow the seller to recover its costs over a reasonable period of time, plus a profit commensurate with that found in sales of the same class or kind of goods. *See* 19 C.F.R. § 152.103(l)(1)(iii).

This Court previously directed the lower court in its remand instructions to "reconsider whether Meyer may rely on the first-sale price." *Meyer Corp., U.S. v. United States*, 43 F.4th 1325, 1333 (Fed. Cir. 2022). However, the CIT did not follow this Court's instructions on remand. Given this failure, Meyer submits that any further remand should contain specific instructions concerning the proper test to be applied to the "first sale" transactions in any new trial, or in any additional proceedings conducted pursuant to 28 U.S.C. § 2643(b).

## III.   The CIT Erred When it Found as a Matter of Law that Meyer U.S. Was Obligated to Furnish the Financials of its Parent Company, MIH.

It was clear error for the CIT to impute any relevance to the financial statements of Meyer's parent holding company, MIH, in determining the transaction

---

[11] The only time interest rates are relevant to transaction value appraisement is when payment for goods is made over an extended time, and the buyer wishes to have any interest paid excluded from transaction value. In those cases, the interest payments must be made pursuant to a written agreement and the interest must be paid at market rates. *See e.g.*, *Luigi Bormioli Corp. v. United States*, 24 C.I.T. 1148 (2000), *aff'd* 304 F.3d 1362 (Fed. Cir. 2002); *Skechers USA Inc. v. United States*, 27 C.I.T. 1225 (2003). This situation is not presented here.

value of the imported merchandise, or to draw any adverse inference from their absence from the record. Customs' uncodified "policy" preference to test a seller's profits against the profits of its parent company, is not compatible with the wording of the governing regulation, 19 C.F.R. § 152.103(l)(1)(iii). Indeed, it is incapable of application where, as here, the parent company is not engaged in the sale of goods of the same class or kind. MIH admittedly does not sell any goods, and is not an appropriate subject for comparison. Even if this Court were to find that the Customs policy is not *per se* contrary to the governing regulation, its application in this case would nonetheless be both inappropriate and impossible.

## A.    The Circumstances of Sale Tests.[12]

The overarching legal principle applied in determining the accuracy of a transaction value in a related party transaction is whether the relationship between the buyer and seller "influences the price actually paid or payable" for the merchandise under review. 19 U.S.C. § 1401a(b)(2)(B). That principle is applied whether the price under review is a "first sale" for exportation to the United States, or a second, or subsequent, sale.

---

[12] 19 U.S.C. § 1401a(b)(2)(B) provides:

> The transaction value between a related buyer and seller is acceptable for the purposes of this subsection if an examination of the circumstances of the sale of the imported merchandise indicates that the relationship between such buyer and seller did not influence the price actually paid or payable …

Customs' enacted implementing regulations setting forth the standards by which related party prices could be tested. *See* 19 C.F.R. § 152.103(l). No inquiries of the underlying economies of the sellers' sovereign are contemplated. The regulation makes no distinction between a "market economy" price and a "non-market" economy price. The tests apply to all tested related party transactions, regardless of the origin of the goods.[13] Both of the tests are recited in 19 C.F.R. § 152.103(l)(1).

---

[13] In the opinion now under appeal, the lower court wrote (Appx3 (emphasis added)):

> That does not mean, however, the statute <u>as written</u> necessarily contemplates zero distinction between sellers operating in market economies and those operating in non-market economies…"

With due respect to the lower court, that is exactly what most favored nation ("MFN") treatment means:

> With respect to customs duties and charges *of any kind* imposed on or in connection with importation … and with respect to the method of levying such duties and charges, … any advantage, favour, privilege or immunity granted by any contracting party to any product originating in or destined for any other country shall be accorded immediately and unconditionally to the like product originating in or destined for the territories of all other contracting parties.

*See* General Agreement on Tariffs and Trade, Article 1, Oct. 30, 1947, 61 Stat. A-11, 55 U.N.T.S. 194.

The leading treatise on the GATT Customs Valuation Code, on which the United States Customs valuation statute is based, restates the Code's requirement that valuation procedures should be of general application without distinction between sources of supply, and notes:

> This criterion is essentially another aspect of neutrality. Non-discrimination is one of the foundations of the international trading system which has grown up among the nations. The Code's valuation provi-

If an importer demonstrates that it passes *either* of the tests, the related party price

is accepted.

### 1.    Normal Pricing Practices Test.

The first test for evaluating related party prices is known as the "normal

pricing practices test." The governing regulation, 19 C.F.R. § 152.103(l)(1)(ii),

provides:

> If it is shown that the buyer and seller, although related, buy from and
> sell to each other as if they were not related, this will demonstrate that
> the price has not been influenced by the relationship, and the transaction
> value will be accepted. If the price has been settled in a manner con-
> sistent with the normal pricing practices of the industry in question, or
> with the way the seller settles prices for sales to buyers who are not
> related to him, this will demonstrate that the price has not been influ-
> enced by the relationship.

Plaintiff-Appellant's expert witness, Mr. Craig Pinkerton of PWC, testified at trial

that he performed the "normal pricing practices test" by comparing the rate of profit

earned by the Thai and Chinese producers of Meyer's products against the profits

---

sions are to be applied by the signatory states to imports from all coun-
tries, whether or not the exporting countries apply the Code. And one
of the most important reasons for having a uniform international Code
governing valuation is to prevent discrimination against particular
products or companies or countries, which if unchecked could lead to
retaliation and destructive 'economic warfare' of various kinds.

Sherman and Glashoff, *Customs Valuation: Commentary on the GATT Cus-
toms Valuation Code* (2d ed.) at ¶57.

earned by an array of producers of similar goods in the industry—known as "benchmark companies"—and that the profit earned by the Meyer companies was within the interquartile ratio of profits earned by others in unrelated party sales. Appx48-50. This, of course, was the standard accepted by CBP in the past. Appx49. Mr. Pinkerton's expert testimony was not seriously challenged at trial. The Government did not put on any fact or expert witnesses of its own. The preponderance of the evidence regarding this test thus supports a finding that the "first sales" under review are acceptable for establishing transaction value under the criterion set out in 19 C.F.R. § 152.103(l)(1)(ii).

### 2.    All Costs Plus Profit Test.

The second test is known as the "all costs plus profits" test, with the governing regulation providing:

> If it is shown that the price is adequate to ensure recovery of all costs plus a profit which is equivalent **to the firm's overall profit** realized over a representative period of time (*e.g.*, on an annual basis), **in sales of merchandise of the same class or kind**, this would demonstrate that the price has not been influenced.

19 C.F.R. § 152.103(l)(1)(iii) (emphasis added). The issue presented for resolution by this Court is the meaning of the term "the firm," as used in this regulation and as applied to the facts of this case.

25

In an uncodified policy statement interpreting this Regulation, Customs has stated that the term "firm" is "normally" interpreted to be the parent company.[14] Therefore, under the "normal" Customs rule, the profit earned in sales by the party selling the goods for export to the United States is to be compared to the profit earned by the seller's parent company in its sales elsewhere of goods that are of the same class or kind. This interpretation, when applied to the facts of this case, is not consistent with the wording of the regulation.

Customs' regulation, 19 C.F.R. § 152.103(l)(1)(iii), requires "that the price is adequate to ensure recovery of all costs plus a profit which is equivalent to the firm's overall profit realized over a representative period of time (*e.g.,* on an annual basis), in sales of merchandise of the same class or kind." The "firm" referred to in the regulation is clearly the firm which charged the price in the related party sale—*i.e.,* the seller. The seller's "parent" company is never mentioned.

---

[14] "In applying this test, CBP normally considers the 'firm's overall profit … ' to be the profit of the parent company." *See Determining the Acceptability of Transaction Value for Related Party Transactions (an Informed Compliance Publication),* U.S. Customs and Border Protection (April 2007), at 9. Appx38-39.

It should be noted that ICPs are not regulations adopted after notice and comment in accordance with the Administrative Procedure Act ("APA"), nor do they have the regulatory status of rulings which represent the "official position" of Customs with respect to an issue. *See* 19 C.F.R. § 177.9(a). The Trade Court has indicated that ICPs are "neither binding on the court nor entitled to deference." *EOS of N. Am., Inc. v. United States*, 37 C.I.T. 637, 654 (2013). This Court has affirmed decisions where the Trade Court has declined to grant deference to statements appearing in an ICP. *See Intercontinental Marble Corp. v. United States*, 381 F.3d 1169 (Fed. Cir. 2004).

Here, the profit earned by the Thai and Chinese producers could not be com-
pared with the profit earned by the parent company, MIH, because MIH is a holding
company, not an operating company—thus, by definition, MIH is not a seller of
goods.[15] Mr. Pinkerton of PWC was well aware of the limitations created by the
policy statement, and—absent any contrary direction from Customs—he followed
the regulatory language and compared the manufacturing companies rate of profit
on goods sold for export to the United States against the rate of profit by the producer
as a whole.[16] Accordingly, Mr. Pinkerton reported that the two rates of profit were

---

[15]A holding company is a company that doesn't conduct any operations,
ventures, or other active tasks for itself. Instead, it exists for the purpose
of owning assets. In other words, the company does not engage in the
buying and selling of any products and services. Instead, it was formed
so that it gains control over one or more companies.

Corporate Finance Institute, Definition of Holding Company. CorporateFinanceIn-
stitute.com, https://corporatefinanceinstitute.com/resources/management/holding-
company/ (last accessed April 30, 2023). The term "holding company is generally
contrasted with the term "operating company."

[16] Mr. Pinkerton testified as follows, Appx46:

Q. [Mr. Donohue]:   Why didn't you compare the MIL, the profit that you
identified on sales for export to the United States,
against the parent company profit, which in this case
would have been MIH?

A. [Mr. Pinkerton]   Well, for a few reasons. One is, we can recognize
that MIH is the ultimate parent company in this transac-
tion, but MIH is a holding company, I believe, in the
British Virgin Islands, and they don't have sales of
cookware that flow through them. So according to the
interpretive note, you have to compare the profit -- has

"equivalent within a normal range."[17] This allowed a comparison of profits on the sales undergoing examination against profits on the seller's overall sales.

Consistent with Customs' own regulation, PWC defined the "firm" properly as a *seller of goods*. As explained, this approach conflicts with Customs' non-binding ICP policy statement[18] (which would have sought a review of the profit of a parent company, MIH, which was not a seller of goods). Clearly, the language of a

---

> to be equivalent to the firm's overall profit realized over a representative period of time. And sales of merchandise of the same class or kind, MIH doesn't manufacture anything. They don't sell anything and, not to my knowledge. They certainly don't cook anything. My understanding is their profits are derived from capital gains and investments in real estate. So I found it quite misplaced to compare the profit of what I would believe to be the Thai limited risk manufacturer in Thailand, and arguably a third-world country against a holding company in the British Virgin Islands to compare the profitability of a Thai manufacturer again to the profitability of a holding company that has all the entities rolling up to it. I certainly didn't see any economic basis for that comparison. And it wouldn't have met the test as outlined by interpretive note 3.

Q. [Mr. Donohue]:   Thank you. It wouldn't have met the regulatory test?

A. [Mr. Pinkerton]   Correct.

[17] Appx47.

[18] *See Determining the Acceptability of Transaction Value for Related Party Transactions (an Informed Compliance Publication),* U.S. Customs and Border Protection (April 2007), at 9. Appx38-39.

regulation having the force and effect of law, adopted pursuant to the required State-

ment of Administrative Action accompanying the Trade Agreement Act of 1979,[19]

must prevail over language in a non-bonding agency policy statement indicating a

"preference" for a comparison with parent company profit levels. In fact how, on a

going forward basis, the discrepancy between the regulation requiring a comparison

between a profit of the "firm" would be managed when the parent is not a producer

of goods was so consequential to the administration of this regulation that, on open-

ing argument at trial, Counsel for Plaintiff-Appellant specifically suggested that the

lower court give importers guidance on that point.[20] We now ask this Court for that

guidance.

---

[19] Statement of Administrative Action accompanying the Trade Agreements Act of 1979, H. Rep. No. 4537, reproduced in 1979 U.S.C.C.A.N 665. It is well-settled that a substantive regulation has the force and effect of law. *Mead Corp. v. United States*, 553 U.S. 218 (2001). Agency interpretive rules do not have such force and effect, and are not accorded that weight in adjudicatory proceedings. *Perez v. Mortgage Bankers Assn*, 575 U.S. 92 (2015).

[20] Counsel in Plaintiff-Appellant's opening statement noted (Appx40-41):

> Sometimes a court just decides, but this court is at its best when it both decides and teaches…. The international trade community is looking for a greater degree of both clarity and certainty as to how this all costs plus profits test is to be administered and specifically as it relates to the influence in the regulation of the word "firm."

The issue of who should be identified as the "firm" for purposes of applying the test in 19 C.F.R. § 152.103(l)(1)(iii) is discussed at length in a newly published treatise:

> An early question that arises is, Whose cost and profit? The "all costs plus a profit" postulate does not refer to either a buyer or a seller when it uses the more general term "firm," but it can be deduced that the profit compared is the seller's profit because it is profits arising from "sales" rather than from "purchases" or "resales" which would reflect on the buyer's profit experience.[21]

The treatise notes that in scores of customs rulings addressing this question:

> CBP has not always trod a consistent path. In some instances, CBP has referred to the foreign seller's costs and profit. CBP has also measured the acceptability of pricing based on the buyer's costs and overall profit. In some rulings, CBP has expressed the criterion in terms of the exporter's costs and profit. There is even a ruling in which CBP has referred to the manufacturer's costs and profit.[22]

Referring to the stated preference for using the parent company's profit, as set out in CBP's 2007 ICP,[23] the commenter notes:

> To this point, CBP has never provided any explanation or shared any rational basis for this interpretation. Nor had there been any judicial approval of this CBP interpretation until the 2021 Court of International

---

[21] Mark K. Neville Jr., *The Customs Valuation Agreement: Origins, Standards and Interpretations* (1st ed. 2023), at 310. [Mr. Neville is not affiliated with Plaintiff-Appellant's counsel].

[22] *Id.* (citations omitted).

[23] *Determining the Acceptability of Transaction Value for Related Party Transactions (an Informed Compliance Publication),* U.S. Customs and Border Protection (April 2007), at 9. Appx38-39.

Trade decision in *Meyer Corporation U.S.*[24] There, the trial court judge merely adopted as the findings of the court the government's recital of facts which included its exposition of the "parent's costs" standard. At the present time, despite the issuance of four separate opinions, the true nature of this COS [*i.e.,* circumstances of sale] test remains an open question and we must await a definitive judgment of the CBP interpretation.[25]

This appeal provides the platform for this Court to render an authoritative interpretation of the term "firm" as it appears in 19 C.F.R. § 152.103(l)(1)(iii). As the commenter noted above, CBP has never provided any explanation or rational basis for its preference to examine the parent company's profits. Certainly, application of any such preference is impossible in this case, where the parent admittedly does not sell goods, and thus has no profit from the sale of goods. The best interpretation is that the "firm" referred to in the regulation is the seller of the goods undergoing appraisement and that the comparison should be between the profit by the producer on sales for export to the United States against the overall profit of the producer, which is precisely what PWC did here. This comports with the comparison made by Plaintiff-Appellant's expert witness, Mr. Pinkerton.

The lower court has now twice drawn negative (and unjustified) inferences against Plaintiff-Appellant based on the absence of nonparty MIH's financials,

---

[24] *Meyer Corporation U.S. v. United States*, 2021 Ct. Int'l Tr. LEXIS 26, vacated and remanded, 43 F.4th 1325 (Fed. Cir. 2022).

[25] Neville Jr., *supra* note 19 at p.311.

which were not even clearly sought in discovery, nor were they the subject of a motion by Defendant to compel production.[26] The CIT first speculated in its first decision that MIH channeled "non-market economy country influences" to its subsidiaries—a speculation this Court dismissed as *irrelevant* to the determination of transaction value.[27] And in the instant appeal, the lower court interposed a "presumption" that MIH might provide its subsidiaries with "access to credit or capital on terms not available to competitors," or at "below market rates"—considerations equally irrelevant to the question at hand. The question at the heart of this case is the evaluation of prices charged for cookware.

Meyer declined to furnish the non-party holding company's financials on relevance grounds—because MIH was not a seller of goods of the class or kind, and so its profitability was irrelevant under the governing regulations. The CBP ICP's non-binding policy of "normally"[28] comparing the producers profit against the "parent

---

[26] We note that Defendant's discovery request sought MIH's *consolidated* financial reports. Appx32-33. A consolidated financial report would not, *in any case*, have provided the product-specific sales data necessary for the comparison envisioned by 19 C.F.R. § 152.103(l)—even assuming MIH had sales, which it did not.

[27] *Meyer Corp. U.S. v. United States*, 43 F.4th 1325, 1333 (2022).

[28] The ICP fails to specify when its "normal" disposition to use a parent company for comparison purposes does not apply. *See Determining the Acceptability of Transaction Value for Related Party Transactions (an Informed Compliance Publication)*, U.S. Customs and Border Protection (April 2007), at 9. Appx38-39. But presumably, cases such as this, where the parent is not a "seller" of the class or kind of goods undergoing appraisement, would be good cause for departure from the "general" rule.

company" profit is directly contrary to the regulations and therefore incorrect as a matter of law. *Auer v. Robbins* 519 U.S. 452, 461-462 (1997); ("An agency's interpretation of its own regulations is entitled to deference and that interpretation will be accepted <u>unless it is plainly erroneous or inconsistent with the regulation</u>." (emphasis added)); *see also, Eli Lilly v. Board of Regents* 334 F. 3d 1264, 1266 (Fed. Cir. 2003) (citing *American Express Co. v. United States*, 262 F. 3d 1376, 1382 (Fed. Cir. 1996)).

This Court should hold that the phrase "firm's overall profit," as appearing in 19 C.F.R § 152.103(l)(1)(iii), refers to the overall profit of the firm *which charged the related party prices under review*, and not the profit of its parent or any other company.

### 3.    Relevance.

Since the MIH financials could not be used in an "all costs plus profits" test, they lost their "consequence to the determination of the action" and became irrelevant. *See* Fed R. Evid. Rule 401. And if not fairly managed, the MIH report could have led one down a path of review that was uncalled for under either statute or regulation. And that is precisely what happened here. The CIT allowed itself to be seduced by the very circumstances that the relevancy rules seek to avoid. The court wrote:

> The fact that the government herein was not provided with the financial information pertinent to plaintiff's parent company hampered its ability

to discern whether or not the parent of the plaintiff provided any form of assistance to reduce costs.

Appx9. Since the issue was the "circumstances of the sale" between the related parties (the statutory standard), and the sufficiency of the "profit of the seller in sales of goods of the class or kind" (the regulatory standard), "no consequential fact could be proved" by the review of the MIH financials and they were irrelevant. *Magnivision Inc. v. Bonneau* Co. 115 F. 3d 956, 961 (Fed. Cir. 1997) (quoting *Huddleston v. United States*, 485 U.S. 681, 691 (1988) (FRE's protect against unfair prejudice)); *United States v. Abel*, 469 U.S. 45, 54 (1984) (Court has a duty to assess the probative value and relevance of prejudicial evidence). And rather than judge on whether the PWC testimony on the two regulatory standards demonstrated that the "first sale" prices had satisfied the regulatory tests, the lower court meandered into the unknown of what the (irrelevant) MIH financials *might have said* if they were available.

An adverse inference is a form of sanction used to level the evidentiary field when a party to litigation has withheld relevant evidence. *See e.g. Epic Sys. Corp. v. Tata Consultancy Svcs. Ltd.,* 971 F.3d 662 (7th Cir. 2020). However, such an inference is inappropriate unless it is shown that the information withheld is relevant to the action.[29] And it is absolutely inappropriate where, as here, it is based on "pure speculation." *Sovulj v. United States*, 2005 U.S. Dist LEXIS 46700 (E.D.N.Y. 2005).

---

[29] *See e.g., Reino de Espana v. Am. Bureau of Shipping*, 2007 U.S. Dist LEXIS 41498 (S.D.N.Y. 2007); *Great N. Ins. Co. v. Power Cooling, Inc*., 2007 U.S. Dist LEXIS

The CIT has now issued two post-trial decisions in this case. Neither offers any conclusions of law regarding the "first sale" issue, nor has the lower court determined whether the prices in such sales comport with the requirements of 19 C.F.R. § 152.103(l). This Court should vacate the CIT's wholly speculative determination and remand this case with instructions to conduct appropriate additional proceedings directed at addressing the standards set out at 19 C.F.R. § 152.103(l)(1)(iii), and answering the questions relevant to this action.

## IV.     The CIT Again Failed to Discharge its *Jarvis Clark* Obligations.

As in the prior appeal, the lower court erred again by failing to discharge its obligations under *Jarvis Clark Co. v. United States,* 733 F.2d 873 (Fed. Cir. 1984), which requires the Court to reach the "correct" result in every case, using all the means at its disposal. The CIT failed to meet its *Jarvis Clark* obligation in two ways. *First*, it failed to examine the "first sales" to see if they were made at "arms-length" prices, instead applying a "presumption" that they were not, and that prices were distorted based on some unspecified conduct by the holding company MIH. *Second*,

---

66798 (E.D.N.Y. 2007); *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212 (S.D.N.Y. 2003).

assuming, *arguendo,* that some circumstance rendered the "first sales" unaccepta-ble,[30] the lower court was obligated to determine whether such circumstance  also rendered the "second sale" prices unacceptable, precluding the use of transaction value altogether, and requiring that the goods be appraised on a different basis.[31] The lower court failed to do either.

First, the lower court made no examination of the "first sale" prices, disre-garding the studies made by Plaintiff-Appellant's expert Craig Pinkerton and resting its determination solely on a *presumption* that the MIH financials would have con-tained some unspecified disqualifying information. As noted above, the MIH finan-cials are neither relevant nor usable for performing the test set out at 19 C.F.R. § 152.103(l)(1)(iii). What the lower court should have done was to examine the "first sale" transactions to determine if they are acceptable, using the test set forth in 19 C.F.R. § 152.103(l)(1)(iii). That question was answered by the testimony of Mr. Pinkerton, and the reports he prepared. Appx34-37, 56. Defendant offered no evi-dence on this point.

---

[30] If the "first sale" prices are found to be an acceptable basis for transaction value, then no consideration of the "second sale" prices is necessary. *Nissho-Iwai American Corp. v. United States*, 982 F.2d 505 (Fed. Cir. 1992).

[31] This would be particularly so if the circumstance were found to emanate from the holding company MIH, since it owns all of the parties to the "first sales" and the "second sales" as well.

That leads to the next question posed by § 152.103(l)(1)(iii): How do the profits in the "first sales" under consideration compare with the sellers' overall profits realized in sales of merchandise of the "same class or kind?" For this, the CIT received evidence in the form of transfer pricing studies showing profit levels in sales of comparable goods between unrelated parties, and expert testimony indicating that the MIL and MQZ profits were commensurate with those in sales between unrelated parties. This actually relevant information should have been evaluated by the trial court. Meyer submits that this evidence sets out a *prima facie* case establishing that the "first sales" met the test for acceptability set out at § 152.103(l)(1)(iii).[32] By failing to evaluate the prices in the "first sales" according to the test set out in CBP's regulations, the CIT failed to discharge its *Jarvis Clark* obligation.

Furthermore, the CIT's decision sustains—without examination—CBP's decision to appraise Meyer's merchandise on the basis of transaction value, using the "second sales" between the trading companies and Meyer U.S. This again shows that the trial court failed to carry out its *Jarvis Clark* obligation.

In its first opinion, the lower court pointedly refused to review whether the "second sales" for export to the United States were tainted by the same issues which it claimed rendered the "first sales" unacceptable as the basis for transaction value:

---

[32] Mr. Pinkerton performed two studies; one for 2009, in connection with a Customs audit, and one for 2012, the year the goods at bar were entered.

All of the foregoing leads the court to doubt that accurate ascertainment of the "true" value of the "price paid or payable" at the first sale level in the customs duty sense has been demonstrated in this case. ***Whether the same can be said with respect to the second level "price paid or payable," i.e., by Meyer itself as importer, the court need not opine, for no party has proposed an alternative method of appraisement in any event.*** Such matters are best left to the parties in any further nego-tiations as a result of this opinion.[33]

*Meyer Corp. U.S. v. United States*, 2021 Ct. Int'l Tr. LEXIS at *143 (emphasis added*). Now, "affirming" its earlier, vacated decision, the CIT again repeats the fatal error it made previously—*i.e.,* failing to discharge its *Jarvis Clark* obligation to reach the "correct" result, and to determine whether the Government's liquidated values, as established in related party sales, were correct.

In *Jarvis Clark*, this Court held that Congress' grant of equitable powers to the CIT in the Customs Courts Act of 1980,[34] eliminated the "dual burden of proof," which had previously existed in protest cases like the instant one, noting:

> … the trial court cannot determine the correct result simply by dismiss-ing the importer's alternative as incorrect. It must consider whether the government's [determination in liquidation] is correct, both inde-pendently and in comparison with the importer's alternative.

*Id*. However, in the instant case, the lower court left the Government's liquidated appraisements—which relied on the second sale transaction—wholly unexamined,

---

[33] As the lower court entered a final judgment for Defendant, it is unknown what "further negotiations" were contemplated.

[34] Pub. L. 96-417, 94 Stat. 1727 (96th Cong., 2d Sess. 1980).

even while voicing misgivings about possible price-distorting activity by MIH, which, if true, might apply with equal force to the "second sales" made to Meyer U.S.

The lower court's failure to discharge its *Jarvis Clark* duty—an essential component of the standard of review in protest cases—requires this Court to remand this case for further proceedings, directing the lower court to examine the "second sales" and determine whether the goods should be appraised on the basis of "transaction value" at all.[35]

While *Jarvis Clark* involved a tariff classification decision, the rule applies with equal force to valuation cases. This Court recognized such an obligation in *Campbell Soup Co. v. United States*, 107 F.3d 1556, 1558 (Fed. Cir. 1997) (noting *Jarvis Clark* in the context of the initial allocation of burden of proof). And in valuation cases, the CIT has consistently noted and discharged its *Jarvis Clark* obligation to find the correct result by whatever means possible. Just weeks after this Court's *Jarvis Clark* decision, the CIT, in *Ashland Chemical Co. v. United States,* explained:

> There is insufficient evidence before the Court to reach a final judgment. Even if it would be correct in a formal sense to say that plaintiff

---

[35] The *Jarvis Clark* Court, in denying a motion for rehearing, noted (739 F.2d at 629):

> … the abolition of the dual burden will add a stability to the customs laws that has been lacking. A judicial decision will now represent a statement of correct law, useful to future importers, rather than simply a narrow ruling based on the particular circumstances in the case.

has a burden of proving its claimed appraised value, the consequence of a failure to do so should not automatically be a victory for the government. *Jarvis Clark Co. v. United States*, Appeal No. 83-1106, Slip Op. (C.A.F.C. May 2, 1984) and *House of Adler, Inc. v. United States*, 2 CIT 274, 277-78 (1981). This is a logical corollary of the general powers given to the Court under 28 U.S.C. § 2643(b), when the Court considers that further administrative or adjudicative procedures are needed to enable it to reach a correct decision. The Court is of the opinion that further proceedings are needed in this case in order to determine a proper appraised value.

7 C.I.T. 362, 367-68 (1984). Thus, even assuming, *arguendo*, that the lower court was correct here that Meyer had not proven its entitlement to a "first sale" transaction value appraisement, the court was not entitled to presume, without examination, that the "second sale" transactions were the appropriate basis for transaction value, or that transaction value is the appropriate basis for appraisement at all. As noted above, concerns about distortions or benefits channeled through MIH could apply to the "second sales" as well as the "first sales"—all the commercial actors are owned by MIH.

In *Peerless Clothing Int'l, Inc. v. United States*, 602 F. Supp. 2d 1309, 1315-16 (Ct. Int'l Tr. 2009), the CIT discussed the centrality of the *Jarvis Clark* obligation to resolving Customs valuation disputes:

In Customs cases, the court is charged with making findings of fact and conclusions of law *de novo*. 28 U.S.C. § 2640(a). When making these determinations, the role of the court is to reach the correct result. *Jarvis Clark Co. v. United States*, 733 F.2d 873, 878 (Fed. Cir. 1984).

40

Indeed, the Trade Court has consistently followed its *Jarvis Clark* obligations

to find the correct result by any appropriate means in valuation cases. *See e.g.*, *VWP*

*of Am. v. United States*, 163 F. Supp. 2d 645, 667 (Ct. Int'l Tr. 2001) (court dis-

charged *Jarvis Clark* obligation by remanding case to CBP for further proceedings);

*Target Corp. v. United States* 31 C.I.T. 154 (2007) (holding that *Jarvis Clark* re-

quired the court to set down the case for fact finding at trial); *La Perla Fashions,*

*Inc. v. United States*, 9 F. Supp. 2d 698, 700 (1998) (incorporating the *Jarvis Clark*

requirement in its discussion of the applicable standard of review).

Yet, for the first time since *Jarvis Clark* was decided, the CIT failed to apply

the rule in this case. It did not exercise its obligation to find the correct result; it did

not even examine the "second sale" prices CBP relied on in liquidation. It improperly

thrust on the Plaintiff the burden of proving the absence of distorting effects, when

that burden rests squarely with the CBP authorities.[36]

---

[36] As noted in *Sherman and Glashoff, Customs Valuation: Commentary on the GATT Customs Valuation Code* (2d. 1987), at ¶ 612:

> The right of the importer to be heard and to respond if Customs has 'grounds' (*i.e.*, facts beyond mere relationship) for considering that the relationship has influenced the price, cannot be construed to shift to the importer the burden of proving that any price in a transaction between related persons is not influenced. This burden of proof stays with Customs, and proof has to be based on facts.

In this case, the rejection of Plaintiff-Appellant's proffered transaction value is not predicated on facts—CBP offered none—but rather on surmise or "presumption" concerning the possibility of "non-market economy distortions" and possible trade

41

Even were this Court to agree with the CIT's rejection of Plaintiff's "first sales" as the basis for appraisement in this case, a remand would still be necessary to provide for the necessary examination of the second sale, and other potential bases of appraisement of the merchandise at bar.

The value code establishes a clear priority of valuation appraisement methodologies, 19 U.S.C. § 1401a. If the "first sale" is not acceptable as the basis for transaction value, then the "second sale" must be given equal examination—which was not done here. If neither sale price is acceptable as the basis of transaction value, then the goods must be appraised according to an alternative basis of appraisement specified in the statute—deductive value, 19 U.S.C. § 1401a(d), or computed value, *id.*, § 1401a(e), before possibly resorting to "residual" appraisement as set out in *id.* § 1401a(f). This Court should vacate the lower court's opinion and remand this matter for further consideration of the proper basis of appraisement.

---

distorting practices carried out by the MIH. The lower court twice upheld an appraised value it pointedly declined to even examine. This failure to discharge its *Jarvis Clark* obligation is, *ipso facto* ground for vacating and remanding the lower court's decision.

## V.    This Court Should Remand Back to the CIT With Instructions to Con-
##        duct a New Trial as to Whether the Tests Set Out in 19 C.F.R. § 152.103(l)
##        are Satisfied.

By way of remedy, this Court should vacate the CIT's judgment of dismis-
sal,[37] and remand this case, including in its mandate a direction that the lower court
conduct a new trial addressing solely the question of whether the "first sales" in
question satisfy the tests for acceptability set out at 19 C.F.R. § 152.103.

While the CIT, in the decision appealed from, stated that "an extensive record
was developed before this court," which is "more than sufficient for conducting re-
consideration now," Appx11, it did not, in fact, cite to any portion of that record,
other than to note that plaintiff had not placed the financial records of the holding
company MIH on it. To carry out this Court's mandate to "reconsider whether Meyer
may rely on the first sale price" will require a more probing review of the trial record.
However, as a result of the Trade Court's curious first post-trial opinion, it is difficult
to know precisely what the trial record consists of.

To establish the acceptability of the first-sale prices, plaintiff at trial relied on
the testimony of its witness Craig Pinkerton who, after a lengthy *voir dire* by gov-
ernment counsel, was accepted by the Court as an expert witness under Federal Rule

---

[37] CIT Rule 58(a) provides that, with exceptions not relevant here, every judgment
and amended judgment must be set out in a separate document. As previously noted,
Senior Judge Aquilino did not issue a separate judgment here, but "affirmed" the
judgment of dismissal this Court had previously vacated.

of Evidence 702. Appx45. Mr. Pinkerton testified for a full day on October 11, 2019, and his testimony relied on various exhibits, including a benchmarking study which Mr. Pinkerton had prepared, Appx34 [Plaintiff's Exhibit 119], and a transfer pricing study he had conducted, Appx57 [Plaintiff's Exhibit 125]. Both were received into evidence, Appx53, and Mr. Pinkerton testified extensively as to both of them.

In its first post-trial decision of March 1, 2021, the lower court spent a great deal of its 120-page opinion reciting the parties' proposed findings of fact and con-clusions of law. It did not adopt either party's conclusions of law, but did adopt the Defendant's proposed findings of fact:

> Upon due and lengthy deliberation, the court finds defendant's recital of the facts from trial, above, accurate, and they are hereby adopted as the findings of the court.

*Meyer Corp., U.S. v. United States*, 2021 Ct. Intl. Trade LEXIS 26 at *139.

Defendant's proposed "findings of fact" raised objections to the admissibility of numerous documents which had been received into evidence at the trial, including the Plaintiff's Exhibits 119 and 125. *Id.* at *89-100. Citing from the Defendant's proposed findings of fact, the lower court stated:

> Meyer did not satisfy any of the prerequisites of FRE 1006. Therefore, plaintiff's Exhibits 119, 125, 154, 155, 156, 379 and 380 must be ex-cluded as inadmissible. Def. PPF&CL, pp. 11-12 (citation omitted). Similarly, testimony reciting information from these inadmissible doc-uments should be disregarded. *See Thompson v. United States*, 342 F.2d 137, 140 (counsel should not be permitted to elicit testimony under the guise of refreshing recollection through the use of a prepared document

44

> to obviate the necessity of introducing original records). Accepting testimony based on inadmissible summaries would undermine the very reason for FRE 1006 and should be rejected. *Id.* at 12.

*Id.* at *94-95. The difficulty with this passage is that it is impossible to discern whether the trial court did in fact exclude these exhibits and testimony from evidence. The lower court did not make express rulings on the admissibility of the exhibits nor did it strike particular testimony. It simply held "defendant's recital of the facts from trial" to be accurate, *id.* at *39, and that "they are hereby adopted as the findings of the court." *Id.*

While the lower court cited to the Defendant's proposed findings of fact in the passage quoted above, the Defendant's contentions as to the admissibility of evidence under the FRE would appear to be more in the nature of a legal conclusion than the recital of trial facts. The lower court's opinion makes it impossible to know whether Defendant's admissibility arguments were among the fact recitals it adopted as "findings of the court."[38] Stated another way, the lower court's oddly constructed opinion makes it impossible to know what the trial record consists of—or what the lower court itself considers it to be.[39]

---

[38] It would be curious indeed for a court, post-trial, to exclude evidence already admitted, including in some cases over the objection of defendant. This is particularly so where no motions to exclude are pending (all parties having rested, giving the plaintiff no opportunity to address any such objection).

[39] Plaintiff-Appellant disputes the characterization of Plaintiff's Exhibits 119 and 125 as Fed. R. Evid. 1006 summaries and would have so indicated had the lower court requested briefing on the issue. Fed. R. Evid. 1006 summaries are compilations

It is well-established that an appellate court may issue a mandate ordering a new trial, *see e.g., Perlmutter v. U.S. Gypsum Co.*, 54 F.3d 659 (10th Cir 1995), including a trial on a single question, *see Bobb v. Mod. Prod. Inc*., 648 F.2d 1051(5th Cir. 1981).[40] It is also well-settled that a trial court must follow the appeals court's mandate, *Litman v. Mass. Mutual Ins. Co*., 825 F.2d 1506 (11th Cir. 1997). Plaintiff-Appellant submits that the best way to bring this decade-long litigation to a conclusion is for this Court to vacate the most recent decision and remand this case to the lower court with instructions to conduct a new trial on the last unresolved issue in this action—namely, whether the "first sale" prices of Meyer U.S. are an acceptable basis for determining the transaction value of the merchandise at bar.

---

of data without opinion. *See Kalloo v. Unlimited Mech. of New York*, 977 F. Supp. 2d 187, 198 (E.D.N.Y 2013); *Federal Trade Commission v. Washington Data Resources*, 2011 U.S. Dist. LEXIS 72886 at *9-10 (M.D. Fla. 2011). Plaintiff-Appellant's Exhibits 119 and 125 are expert reports subject to review under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 589 (1993). The compilations on which the expressed opinions are based are not documents which would be independently admissible at trial, but rather documents of publicly-traded entities *other than the parties to this action* filed with regulators.

In any event, at least one court has indicated that summaries—which these exhibits are not—are no longer considered excludable hearsay after an expert has testified to its contents in court, and was subject to cross-examination, as was the case in this trial. *See Monaghan v. Telecom Italia Sparkle of N. Am*, 647 F. Appx. 763 at fn. 3 (9th Cir. 2016).

[40] Overruled on other grounds, *Gautreaux v. Spurlock Marine Inc.*, 107 F.3d 331 (5th Cir. 1997).

## **CONCLUSION**

For the reasons given above, the Plaintiff-Appellant requests that this Court vacate the opinion and judgment of the CIT and remand this matter for proceedings consistent with this Court's opinion.

Respectfully submitted.

/s/ John P. Donohue
John P. Donohue
  *Counsel of Record*
NEVILLE PETERSON LLP
100 N. 18th Street, Ste. 300
Philadelphia, PA 19103
(267) 207-3421
jdonohue@npwny.com

John M. Peterson
Patrick B. Klein
NEVILLE PETERSON LLP
55 Broadway, Suite 2602
New York, NY 10006
(212) 635-2730
jpeterson@npwny.com

Richard F. O'Neill
NEVILLE PETERSON LLP
701 Fifth Ave, Ste. 4200-2159
Seattle, WA 98104
(206) 905-3648
roneill@npwny.com
*Attorneys for Plaintiff-Appellant*

May 9, 2023

## <u>CERTIFICATE OF COMPLIANCE WITH<br>TYPE-VOLUME LIMITATIONS</u>

I hereby certify that the foregoing Principal Brief of Plaintiff-Appellant, Meyer Corporation, U.S., complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules. It was prepared using a proportionally-spaced typeface and includes 12,065 words.

                     /s/ John P. Donohue
                       John P. Donohue

May 9, 2023

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 9th day of May, 2023, I electronically filed the foregoing Principal Brief of Meyer Corporation, U.S., with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit through the Court's CM/ECF system. Participants in this case who are registered CM/ECF users will be served by the appellate CM/ECF system.

          /s/ John P. Donohue   
            John P. Donohue

May 9, 2023

Slip Op. 23-13

UNITED STATES COURT OF INTERNATIONAL TRADE

- - - - - - - - - - - - - - - - - - - -x Senior Judge Aquilino

MEYER CORPORATION, U.S.,                    :

                    Plaintiff,        :

            v.                          : Court No. 13-00154

UNITED STATES,                          :

                    Defendant.       :

- - - - - - - - - - - - - - - - - - - -x

Opinion & Order

[Upon appellate remand to "the court to
 reconsider whether Meyer may rely on the
 first-sale price", that reconsideration
 on the record at bar concludes that it
 may not.]

Decided: February 9, 2023

    John M. Peterson, John P. Donohue, Richard F. O'Neill, and
Patrick B. Klein, Neville Peterson LLP, New York, NY, for the
plaintiff.

    Justin R. Miller, Attorney-in-Charge, and Beverly A. Farrell,
Senior Trial Attorney, U.S. Department of Justice, Civil Division,
Commercial Litigation Branch, International Trade Field Office, New
York, NY, and Brian M. Boynton, Principal Deputy Assistant Attorney
General, Civil Division, and Patricia M. McCarthy, Director, U.S.
Department of Justice, Civil Division, Commercial Litigation
Branch, Washington, D.C., for the defendant.


    AQUILINO, Senior Judge:  The mandate of the U.S. Court of

Appeals for the Federal Circuit (CAFC") having issued pursuant to

its decision to remand supra sub nom. Meyer Corp. v. United States,

43 F.4th 1325, 1333 (2022) ("Meyer III"), has led the parties to file papers in regard thereto.

Presumed herein is familiarity with this test case on valuation under 19 U.S.C. §1401a of 125 different sets of pots and pans imported from the People's Republic of China ("PRC") and the Kingdom of Thailand and the extensive record and prior decisions thereon. See Meyer Corp. v. United States, 41 CIT ___, 255 F.Supp.3d 1348 (2017) ("Meyer I") (summary judgment granted in part and denied in part); Meyer Corp. v. United States, 45 CIT ___, Slip Op. 21-26 (March 1, 2021) ("Meyer II") (opinion after trial; judgment for defendant).

The CAFC affirmed the finding that steel discs exported to Thailand from China underwent only one substantial transformation, not two, and that the resultant cookware for the U.S. was thus not entitled to duty-free treatment. Meyer III, 43 F.4th at 1330-32. It also vacated and remanded plaintiff-appellant's first-sale claim, stating that "there is no basis in the statute for Customs or the court to consider the effects of a nonmarket economy on the transaction value and require a party to show the absence of all 'distortive nonmarket influences.'" Id. at 1332. The CAFC decision goes on to state that 19 U.S.C.

§1401a(b)(2)(B) "concerns effects of the relationship between the buyer and seller, not effects of government intervention, and especially not with government intervention that affects the industry as a whole."  Id. at 1332-33.

From this court's perspective, because the purpose of the General Agreements on Tariff and Trade was to promote trade liberalization among market-oriented countries and help spread democratic values that were associated with capitalism, in opposition to fascism and the "Iron Curtain" that was descending on Europe in the aftermath of World War II,[1] the fact that the valuation statute presupposes a "market" environment focusing on the individual transaction is unsurprising.  That was the purpose of the GATT negotiations.

That does not mean, however, the statute as written necessarily contemplates zero distinction between sellers operating in market economies and those operating in nonmarket economies,

---

[1] See, e.g., GATT 1947: How Stalin and the Marshall Plan helped to conclude the negotiations, available at https://www.wto.org/english/tratop_e/gatt_e/stalin_marshall_conclude_negotiations_e.htm (last checked this date).

particularly in view of the judge-made "first sale" rule[2] on the

"price paid or payable" of 19 U.S.C. §1401a(b)(1) ("[i]f sufficient

information is not available, <u>for any reason</u>,[3] with respect to any

amount" necessary to increase the "price actually paid or payable

for imported merchandise . . . by the amounts attributable" to the

items listed as (A) through (E) of §1401a(b)(1)(packing costs,

selling commissions, assists, royalties, license fees, and, of some

import to this case, "the proceeds of any subsequent resale,

disposal, or use of the imported merchandise that accrue, directly

or indirectly, to the seller"), then the transaction value of the

imported merchandise concerned "shall" be treated as one that

cannot be determined).  It was the CAFC itself, in fact, which

articulated the concept of "the absence of any non-market

influences that affect the legitimacy of the sales price" -- apart

from the language of the statute itself.  See <u>Nissho Iwai Am. Corp.</u>

<u>v. United States</u>, 982 F.2d 505, 509 (Fed.Cir. 1992).

---

[2]  That rule evolved from the prior concept of "export value."  <u>See</u> Tariff Act of 1930 §402(d) (June 17, 1930).  It has been maintained by various judicial decisions, even under the current valuation statute.  <u>See</u>, <u>e</u>.<u>g</u>., <u>United States v. S.S. Kresge Co.</u>, 26 CCPA 349, 352 (1939); <u>R.J. Saunders & Co. v. United States</u>, 42 CCPA 55, 59 (1954); <u>United States v. Getz Bros. & Co.</u>, 55 CCPA 11 (1967); <u>E.C. McAfee Co. v. United States</u>, 842 F.2d 314 (Fed. Cir. 1988); and <u>Nissho Iwai Am. Corp. v. United States</u>, 982 F.2d 505 (Fed.Cir. 1992).

[3]  Emphasis added.

Be that as it has been, the current CAFC panel having,
seemingly unequivocally, answered Meyer II's earlier question or
observation on that point, this court, accordingly, will continue
its consideration of the substance of the matter, as developed
before, during, and after trial.

                                  I

The plaintiff commenced this action seeking first-sale
treatment for its imported cookware from the PRC, and duty-free
treatment under the Generalized System of Preferences (GSP) for
certain cookware imported from Thailand, a beneficiary developing
country (BDC). After extensive discovery, the parties cross-moved
for partial summary judgment on whether cookware sets containing a
non-de minimis, non-BDC component could qualify the entire set for
GSP treatment; and whether Meyer's imported cookware is viably
valued at the price between the Thai producer and a middleman
(first-sale price), both of which are Meyer related.  Meyer I, 41
CIT at ___, 255 F.Supp.3d at 1350-51.

On the set issue, this court determined that the presence
of a non-BDC component in a set would not preclude BDC components
from receiving GSP treatment, although such treatment would not
extend to a non-BDC component.  Id., 41 CIT at ___, 255 F.Supp.3d

at 1355-59.  However, the issue of whether the Thai-made components were entitled to duty-free treatment under the GSP was yet to be resolved.  In determining whether first-sale could present a viable value for the related entities, this court found that the government had not waived the issue of Meyer's failure to provide its parent's financial information as requested during discovery. Id., 41 CIT at ___, 255 F.Supp.3d at 1360-61.  This court further held that "[a]ll of the entities relevant to that issue [i.e. dealing at arm's length] are related, and therefore the financial information pertaining to the parent is also relevant to examining whether any non-market influences affect the legitimacy of the sales price."  Id., 41 CIT at ___, 255 F.Supp.3d at 1361.  Finally, after noting that the first-sale-transaction issue revealed disputed material facts, this court required the parties to confer and propose how to proceed.  Id., 41 CIT at ___,  255 F.Supp.3d at 1362.

Ultimately, a trial was held on the issue of whether certain Thai cookware had undergone double substantial transformation and thus satisfied the requirements for duty-free treatment under the GSP, and also the issue of whether first-sale-transaction price was a viable value for the imported merchandise.  Between the Meyer I decision and commencement of the

trial, Meyer did not amend its discovery responses to include its parent's financial information.  Although the plaintiff presented direct testimony from five witnesses at trial, such testimony did not include witnesses from Meyer Manufacturing Company Limited (Meyer Hong Kong) or from Meyer International Holdings Limited (Meyer Holdings), the direct parent company of the plaintiff, the Thai producer, Meyer Macau, Meyer Hong Kong, and the indirect parent of the PRC producer.

After trial, the parties submitted competing findings of fact and conclusions of law.  After considering them, this court concluded that GSP treatment was not available for Thai cookware manufactured from steel discs obtained from the PRC because no double substantial transformation of the discs had occurred by the Thai manufacturing process.  <u>Meyer II</u> at *50.

This court further held that, "[b]ased on the applicable law and the evidence adduced at trial, the plaintiff has also failed to establish that it should be entitled to use the transaction value between the China producer and Meyer Hong Kong or the Thai producer and Meyer Macau ('first sale') for the appraisement of the imported cookware."  <u>Id</u>.  This court noted that, for the "all costs plus profit" test, costs are critical and

that the costs of the inputs from the PRC are suspect.[4]  It also

found that "no CBP regulation requires that the 'firm' mentioned in

19 C.F.R. §152.103(1)(1)(iii) be the 'parent' of the importing

party." Id.

Regardless, even if the costs of inputs were not suspect,

this court observed that the parent company "Meyer Holding[s]

presumptively had the ability to influence the price paid or

payable for them." Id. at *51.  Moreover, "[w]ithout financial

statements, th[is] court has no concept of the extent to which the

finances of the Meyer group units are truly independent 'silos' of

one another, or the extent to which there might have been state

influence or assistance to some degree." Id.  For whatever reason,

in vacating and remanding Meyer II, the CAFC does not address these

observations.

II

Facts drive the law.  It is not the other way around.

Even ignoring the fact that the claimed transaction values involve

---

[4]  The CAFC decision does not directly address this
necessary observation, which remains an element of this cost-plus-
profit case, even if 19 U.S.C. §1401a(b)(2)(B) "concerns effects of
the relationship between the buyer and seller, not effects of
government intervention, and especially not with government
intervention that affects the industry as a whole."

inputs from a non-market-economy country in the merchandise at issue, this court still cannot ignore plaintiff's non-responsiveness to defendant's request for information during discovery.  The fact that the government herein was not provided with the financial information pertinent to plaintiff's parent company hampered its ability to discern whether or not the parent of the plaintiff provided any form of assistance to reduce costs. As this court previously observed (here excising any inference of "nonmarket consideration" in accordance with the CAFC opinion):

> Even if "true" costs of such inputs could be determined, Meyer Holding[s] presumptively has had the ability to influence the price paid or payable for them, for example by providing its subsidiaries access to credit and capital on terms that are not available to competitors without the same level of bargaining power with creditors, or even at "below market" rates.  Without financial statements, the court has no concept of the extent to which the finances of the Meyer group units are truly independent "silos" of one another . . ..

> The most that plaintiffs' witnesses could testify to was that they were unaware of any such assistance . . ..  At trial, the defendant only lightly explored the extent to which such considerations might be considered [ ]distortive.  But then again, the defendant never had the ability to probe deeper, in part because it was never provided the financial information it requested in discovery in order to be able to ask or answer probing questions.

> The court understands that the Meyer parent is not subject to this litigation and that the plaintiff, as its "independent" subsidiary, can claim an inability to obtain such information from it. However, given that the parent has an interest in seeing these types of matters

> resolved favorably, it is therefore presumed to be
> forthcoming, even unprompted, to provide whatever CBP
> deems necessary to assist in their resolution, and the
> fact that in that regard there has apparently been
> considerable "resistance" throughout this case to that
> not unreasonable discovery request and the "assistance"
> that the parent could have provided its subsidiary to
> address necessary questions . . ., speaks volumes.
>
> . . . [T]he foregoing leads the court to doubt that
> accurate ascertainment of the "true" value of the "price
> paid or payable" at the first sale level in the customs
> duty sense has been demonstrated in this case.

Meyer II at *50-51.

As the defendant points out, the prior analysis shows
that plaintiff's failure to provide the financial information
requested by it during discovery provided an independent reason as
to why Meyer could not demonstrate a true first-sale value absent
of influence - not from a nonmarket-economy country per se — but
from the relationships of the related parties.  And the plaintiff
had been forewarned by the court's Meyer I decision as to the
importance of that financial information but chose not to
supplement its discovery responses.

Furthermore, "[a]lthough this Court may exercise such
discretion to rectify a significant flaw in the conduct of the
original proceeding, [t]he purpose of a rehearing is not to
relitigate the case."  Tianjin Magnesium Int'l Co. v. United

States, 36 CIT 1698, 1699 (2012) (quotations and citations omitted).  As discussed above, an extensive record was developed before this court.  It is more than sufficient for conducting reconsideration now.

Finally, this court considers that the CAFC's holding of Nissho Iwai's "nonmarket influences" as simply referring to influences growing out of the relationship of buyer and seller that distort the price paid or payable, coupled with its "remand for th[is] court to reconsider whether Meyer may rely on the first-sale price", negates any need for further proceedings now.[5]  The plaintiff had more-than-adequate opportunity to make its case for first-sale treatment, and any suggestion now for a retrial is inconsistent with Rule 1 of the USCIT rules to "secure the just, speedy, and inexpensive determination of every action and proceeding."

### III

In view of the foregoing, and given the precision of the CAFC remand quoted above, mandating Customs and Border Protection to acquiesce in plaintiff's plea for liquidation of its merchandise

---

[5]  Plaintiff's motion(s) filed after the CAFC mandate issued regarding possible such proceedings can be, and they hereby are, dismissed.

Court No. 13-00154                                                    Page 12

on the basis of its first sale is not warranted, and this court's

judgment entered in <u>Meyer II</u> is therefore hereby affirmed.

        So ordered.


Decided:  New York, New York
          February 9, 2023



                              <u>/s  Thomas J. Aquilino, Jr.</u>
                                  Senior Judge